FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2014 MAR 27 P 3: 07
CLERK'S OFFICE
AT BALTIMORE
BY ___ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT D. JONES | * | |
| Plaintiff | * | |
| v | * | Civil Action No. RDB-13-1843 |
| WARDEN KENNETH HORNING, *et al.* | * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM OPINION

Defendants Kenneth Horning, Comtah Nimely, and Wexford Health Services,[1] have filed Motions to Dismiss or for Summary Judgment. ECF No. 18 and 20. Plaintiff has responded to the motions stating he cannot provide a substantive response without discovery and joinder of Corizon Medical Services, Inc. (Corizon) as a party because it was the primary health care provider for the period covered by the Complaint. ECF No. 24. A hearing in this matter is not necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow Defendants' Motions to Dismiss or for Summary Judgment, construed as Motions for Summary Judgment, SHALL BE GRANTED.

### Background

Plaintiff Robert Jones (hereinafter "Jones") asserts Defendants violated his Eighth Amendment right to remain free from cruel and unusual punishment in connection with medical treatment for a bladder tumor. Jones claims that while he was incarcerated at Maryland

---

[1] Defendants Nimely and Wexford Health Services have also filed a Motion for Other Relief (ECF No. 25) seeking to seal Exhibit 2 filed with their Motion to Dismiss or for Summary Judgment (ECF No. 20) and to substitute the exhibit filed with the Motion for Other Relief. As the exhibit filed with the dispositive motion does not pertain to the claims asserted in this case, the Motion for Other Relief shall be granted.

Correctional Training Center (MCTC), he was seen by medical provider James Neal[2] on May 18, 2010, for problems he was experiencing with his bladder. A referral was made by Dr. Comtah Nimely and Jones was seen by Dr. Chaudry,[3] who performed a biopsy procedure revealing a bladder tumor. On July 13, 2010, Chaudry removed the tumor through a procedure known as cystourethroscopy. Jones claims he was supposed to have a follow-up cystoscopy after the procedure, but it never took place despite the fact he complained about continuing pain and discomfort. ECF No. 1 at p. 2.

On October 10, 2012, Jones was transferred from MCTC to Eastern Correctional Institution (ECI) where he again sought help for incontinence and pain. On November 14, 2012, Jones claims he submitted an Administrative Remedy request (ARP) which "was not signed until November 30, 2012." *Id.* On January 17, 2013, Jones was taken to Bon Secours Hospital where cystourethscopy was performed and removed tissue was found to be cancerous. *Id.*

Jones claims the delay in transporting him to the hospital denied him access to adequate medical care and interfered with prescribed care. Jones asserts that Nimely and the medical staff at MCTC failed to notify necessary parties that medical orders required Jones to be transported to the hospital for follow-up treatment. He further alleges that had he been provided with periodic check-ups he would not have developed chronic cystitis, the trigonitis would have been diagnosed earlier, and he would have a better chance of successfully treating the bladder cancer. *Id.* at p. 3. Jones seeks compensatory and punitive damages.

Defendant Kenneth Horning was the Warden at MCTC from December 2006 through March 1, 2011, the date of his retirement. ECF No. 18 at Ex. 2 (Declaration Under Oath,

---

[2] Neal has not been served with the Complaint, but is named as a Defendant in the Amended Complaint. ECF No. 17.

[3] Chaudry was named as a Defendant in the Amended Complaint, but has not been served. ECF No. 17.

Kenneth Horning). Horning asserts that medical care is provided to inmates at MCTC by a private medical contractor and he had no personal involvement in the provision of medical care to Jones. When Jones complained about medical care, Horning and his staff relied on reports, assessments, and judgments made by the medical services provider. Additionally, Horning asserts he did not interfere with medical care prescribed to Jones. He further states that medical records dated February 11, 2011, indicate that Jones refused to have a "cysto with biopsy" against medical advice and acknowledged that failure to go to the appointment or to have the procedure performed may result in further deterioration of his health to include possible death. ECF No. 18 at Ex. 3, p. 1.

In response to Jones's claim that he was not transported for off-site medical appointments, Horning states that from June 19, 2010 to March 1, 2011, six transport orders for Jones were received for off-site medical appointments and he was transported to each appointment on the scheduled dates. *Id.* at Ex. 4.

Defendant Wexford Health Services asserts that prior to July 1, 2012, it provided utilization review management for the Maryland Department of Public Safety and Correctional Services (DPSCS). ECF No. 20 at Ex. 1. In that role, Wexford received, reviewed, and made decisions on requests for referrals for specialty care and treatment for inmates which included requests for evaluations by specialist physicians, diagnostic testing, and surgical procedures. *Id.* During Wexford's tenure as the utilization review management provider (July 1, 2005 through June 30, 2012), contractual procedure required requests for specialty care to be initiated by the medical care contractor, Corizon, Inc., and to then be directed to Wexford through the on-site medical director or other appropriate staff. *Id.* In the absence of requests made in this manner, Wexford was not authorized to authorize specialty care for inmates. *Id.*

3

With respect to Jones's care, Wexford states that it approved a request for Jones to be seen by a urologist, Dr. Rafique Chaudry, on May 17, 2010. ECF No. 20 at Ex. 1 and ECF No. 25 at Ex. 2, p. 184. During the initial consultation, Chaudry recommended cystoscopy and circumcision to address the issues Jones was experiencing. On May 18 and 20, 2010, requests for cystoscopy, circumcision, and renal ultrasound were submitted to Wexford and all were approved on May 20, 2010. ECF No. 25. at Ex. 2, p. 185.

On June 22, 2010, Chaudry performed Jones's cystoscopy study and circumcision and identified a suspicious bladder mass. ECF No. 25 at Ex. 2, p. 192. Based on that finding, Chaudry recommended an urgent completion of a transurethral resection (TUR) to remove and biopsy the mass. *Id.* Wexford approved the requested procedure on June 25, 2010, the same day the request was received. ECF No. 20 at Ex. 1. On July 13, 2010, Chaudry performed the TUR, removed the mass, and sent the tissue to pathology for testing. ECF No. 25 at Ex. 2, p. 200. On that date a request for Jones's return to Chaudry for post-surgical follow-up for purposes of discussing the results of the pathology testing was presented to Wexford. The request was approved and on July 26, 2010, Jones was re-evaluated by Chaudry. *Id.* at Ex. 2, p. 203. The results of the pathology revealed Jones had grade 1 (one) papillary urothelial carcinoma. *Id.* Chaudry recommended a repeat cystoscopy, PSA screen, and a follow-up evaluation in three months to monitor Jones for recurrence of the cancer. *Id.*

Wexford states that no further requests for consultation were presented until December 9, 2010, when it received a request for repeat cystoscopy and evaluation by a urologist which were approved. On January 14, 2011, Jones was seen by Urologist Laurence Scipio, MD. ECF No. 25 at Ex. 2, pp. 206-207. Scipio recommended that Jones receive a cystoscopy procedure with follow-up cystoscopy every three months. Based on that recommendation, Jones was scheduled

for cystoscopy in February of 2011; however, on that day, Jones refused to undergo the procedure against medical advice and signed a release of responsibility reflecting that refusal. *Id.* at pp. 36, 263 – 66.

Another cystoscopy request was presented to Wexford on January 12, 2012, and approved. ECF No. 25 at Ex. 2, p. 217. Jones's medical records indicated the request was made after Jones inquired about the procedure during a medical visit that day. Jones was reminded by medical staff that he had signed a release of responsibility indicating his refusal to have the procedure, but Jones stated he was mistakenly told he was being transported for a colonoscopy. *Id.* at p. 48. Despite the conflicting information provided by Jones, the cystoscopy was requested on his behalf and approved by Wexford. *Id.* at p. 217. By June 29, 2012, when Jones was seen by Scipio for evaluation, he had not received the cystoscopy. *Id.* at pp. 216-17. Scipio again recommended the procedure and on July 2, 2012, when Jones's chart was reviewed, the request was sent to the physician's assistant for processing the request. *Id.* at pp. 69 – 70.

After July 1, 2012, Wexford became the contracted medical services provider for DPSCS inmates. On July 11, 2012, Jones was evaluated by Dr. Comtah Nimely, who noted Jones had been approved for the cystoscopy. *Id.* at pp. 72 – 74. At that time Jones denied observing blood in his urine or pain with urination, but Nimely ordered routine urinalysis pending Jones's appointment with Scipio. On July 17, 2012, Jones returned to see Scipio, but paperwork authorizing the cystoscopy was incomplete. When Jones was advised of this fact and told the procedure would be rescheduled, he informed Scipio that he was not going to come back. *Id.* at p. 220. The following day when Jones was seen by a nurse for follow-up, he continued to state that he would refuse to go back to Scipio. *Id.* at p. 78.

On July 23, 2012, the authorization paper work was completed and Jones was seen on July 31, 2012, by PA Janine Griffith for pre-operative clearance. *Id.* at Ex 1 and ECF No. 25 at Ex. 2, pp. 81 – 100. Jones denied any abnormalities, but reported increased frequency in urination; he was then medically cleared for cystoscopy with biopsy. ECF No. 25 at Ex. 2, p. 99. The procedure was scheduled for August 6, 2012, but on August 2, 2012, Jones signed a release of responsibility documenting his refusal to be transported for the procedure. *Id.* at p. 267. Jones was seen by Nimely on August 22, 2012, in the chronic care clinic and reiterated that he was not experiencing pain with urination or observing blood in his urine. *Id.* at pp. 106-108. At that time, Jones had not been re-evaluated by the urologist, nor had the recommended procedure taken place. *Id.*

On October 8, 2012, Jones was again evaluated by Nimely and said he had changed his mind about having the cystoscopy study done. Based on Jones's statement, Nimely requested the study to be scheduled. *Id.* at pp. 112 – 15. The following day, however, Jones was transferred from MCTC to ECI and Nimely was no longer involved in his care. He was evaluated by Dr. Paul Matera at ECI on November 14, 2012, and at that time the consult for cystoscopy remained open. Jones voiced no complaints regarding this issue. ECF No. 25 at Ex. 2, pp. 120, 124-25 and ECF No. 20 at Ex. 3.

On December 5, 2012, Jones was again evaluated by Matera for pre-operative physical in preparation for the cystoscopy and biopsy. Upon review of Jones's chest x-ray Matera noted the appearance of densities that could indicate some abnormality which he determined should be investigated through comparison of prior studies. At the time of the pre-operative physical, Jones did not report any urinary symptoms. ECF No. 25 at Ex. 2, pp. 127 – 29. Further review

6

of the chest x-ray determined no abnormalities were present and Jones was cleared for cystoscopy and biopsy on January 2, 2013. *Id.* at pp. 130 – 32.

On January 16, 2013, cystoscopy with biopsy was performed by Scipio. There was no evidence that the tumor removed earlier had recurred, but Scipio did observe a chronic inflammatory change in one portion of the bladder which was biopsied. The results of the biopsy revealed "polypoid cystitis with focal papillary hyperplasia."[4] *Id.* at pp. 230 – 34. Defendants assert the findings made by Scipio have no correlation to the timing of the procedure. ECF No. 20 at Ex. 4. Due to Jones's history of bladder cancer a recommendation for continued re-evaluation was documented. *Id.* at Ex. 3 and 4.

Jones was re-evaluated by Scipio on March 12, 2013, and Jones reported increased frequency and urgency in urination which began after the cystoscopy. Scipio's assessment of Jones after examination was that his symptoms were due to "bilobar prostatic hypertrophy with obstruction of the bladder neck."[5] To treat the condition, Scipio recommended Jones be prescribed Bactrim (an antibiotic) and Oxybutin (a drug that relaxes bladder smooth muscle to decrease urgency and frequency) and also recommended a repeat PSA study with follow-up cystoscopy in three months. ECF No. 25 at Ex. 2, p. 245.

Following his appointment with Scipio, Jones was seen by Matera on March 20, 2013. Jones acknowledged he had been told he was negative for any active bladder cancer and reported no symptoms such as painful urination or blood in his urine. At that time Scipio's notes from the March 12, 2013 visit were not available; thus, Matera advised Jones he would discuss the issue

---

[4] Cystitis is an inflammation of the bladder. Focal papillary hyperplasia is an expected microscopic cellular finding after resection of the bladder which was performed on Jones to remove the tumor in July 2010. ECF No. 20 at Ex. 4.

[5] BPH or benign prostatic hypertrophy is a non-malignant enlargement of the prostate gland commonly occurring in men after age 50 which sometimes lead to compression of the urethra and obstruction of the flow of urine. ECF No. 20 at Memorandum, p. 11, n. 18.

in more detail with him later in chronic care clinic. *Id.* at pp. 150 – 51. On April 2, 2013, Jones was seen in the chronic care clinic and again offered no complaints related to his bladder condition. *Id.* at pp. 153-54. When Jones was seen by Matera on May 7, 2013, he again offered no complaints and said he was feeling well. *Id.* at pp. 157-58. Jones was seen again on June 18, September 13, and September 24, 2013, and again offered no complaints of symptoms related to his bladder disease. *Id.* at pp. 161 – 63; 169, and 171-72.

## Standard of Review

### Discovery

Jones asserts he cannot adequately respond to Defendants' dispositive motions unless he is permitted to engage in discovery to obtain the medical records which were not submitted as exhibits by Defendants. ECF No. 24. Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont, supra*, 637 F.3d at 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)) Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586,

2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary"

and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Jones's declaration does not satisfy the standard under Rule 56(d). He baldly asserts that he needs to review his entire medical record without explaining how records in addition to the more than 200 pages of records submitted might create a genuine dispute of material fact. Thus Jones's opposition to summary judgment based on lack of discovery is without merit.

## Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The Court should view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Because Jones is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94

(2007). But, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff members were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison

11

officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center,* 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d at 390; *citing Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

### Warden Kenneth Horning

Section 1983 liability on the part of the supervisory defendants requires a showing that: "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn,* 896 F. 2d 848, 854 (4th Cir. 1990) (internal citations omitted); *see also Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984) (supervisory liability for an inmate's beating by prison guards).

Jones's claim against Defendant Horning is not altogether clear. To the extent he is alleging Horning or other correctional staff members were responsible for missed off-site appointments, there is no evidence to support that claim. Indeed, there is evidence that establishes Jones himself was responsible for missing appointments by refusing to attend. In any event, there is no evidence that Jones has suffered an injury as the result of any delays in receiving care.

12

To the extent his claim is based on a theory of *respondeat superior*, the claim must fail. The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Thus, Horning is entitled to summary judgment in his favor on the claims asserted against him.

## Wexford and Nimely

Plainly bladder cancer is an objectively serious medical condition; however, in this instance, the objectively serious medical condition was treated in an appropriate manner. Additionally, follow-up care was recommended and approved by the providers and Wexford. Even though Jones declined to be treated as recommended by the specialists he saw, he was provided with additional opportunities to take advantage of follow-up care and advised of the dangers of refusing that care.

The evidence presented in this case does not depict medical providers who have ignored a life threatening illness with callous disregard for the consequences to Jones. Indeed, Jones's assertions that his health has been adversely affected by Defendants' conduct are perplexing to this Court in light of the record evidence produced. It strains credulity to imagine that there may be some missing medical record that might swing the balance of evidence in favor of finding an

Eighth Amendment violation. Even if Jones's bladder cancer had recurred, which it has not, the failure to detect it in a timely fashion is more likely the result of his refusal to submit to further testing than a lack of appropriate care offered to him by the numerous medical care providers involved in his case. Defendants Wexford and Nimely are entitled to summary judgment.

In light of the wealth of evidence that Jones has received care well beyond that which is constitutionally required, his claims against the unserved Defendants, Drs. Neal and Chaudry, shall be dismissed without requiring a response to the allegations against them. A separate Order follows.

March 27, 2014
Date

RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE